Affirmed
and Memorandum Opinion filed March 16, 2010.

In The

 

Fourteenth Court of
Appeals

___________________

 

NO. 14-08-00926-CR

___________________

 

Donald Gill Delauder, Appellant

 

V.

 

The State of Texas, Appellee



 



 

On Appeal from the 268th District Court

Fort Bend County, Texas



Trial Court Cause No. 45886

 



 

 

MEMORANDUM  OPINION

Donald Gill Delauder appeals
the legal and factual sufficiency of the evidence supporting his conviction for
aggravated assault with a deadly weapon.  We affirm.

I.  Factual and Procedural Background

Appellant was charged by
indictment with aggravated assault with a deadly weapon, alleged to have been
committed on or about December 17, 2006.  After a two-day jury trial, appellant
was convicted and subsequently sentenced to twelve years’ confinement in the
Texas Department of Criminal Justice, Institutional Division.

A.        State’s Evidence

Rayzale White testified that
she and appellant had dated for a couple of years and by the time of the
shooting, they had been living together at appellant’s house for about four
months.  According to White, appellant left the house while she was preparing
to go out to a club, and she was the first to return.  She stated that she changed
clothes and was lying on the bed watching television when she heard appellant
call to her from the bedroom doorway.  According to White, she looked at
appellant, then turned away.  White testified that appellant called her name a
second time, and when she looked at him, he was holding a “big gun” in his hand. 
White stated that when she again turned away from him, appellant shot her in
the back.  According to White, appellant then said, “this is how demonic I
am.”  Although White testified at one point that appellant said nothing other
than her name before he shot her, she later testified that she and appellant had
been having an argument and she was ignoring him.  

Wounded, White then escaped
the home through the back door, as appellant sat in a chair in the living room. 
She then made her way to a Texaco gas station where she used a pay phone to
call 911.  On cross-examination, White admitted that she had used cocaine the
day before this incident. 

Deputy Adam Cempa of the
Fort Bend County Sheriff’s Department was dispatched to White’s location at
4:15 a.m. on the day of the shooting and arrived at the gas station at 4:24
a.m.  According to Deputy Cempa, White told him appellant’s name and the name
of the street where the shooting took place.  She additionally described the
residence where the offense occurred and stated that a burgundy Ford Escape was
parked in the driveway of the residence.  After paramedics arrived to care for
White, Deputy Cempa drove to the street White named and located the residence
and vehicle she described.  When no one responded to Deputy Cempa’s knock, he
walked around the building, and through a partially-open window, he saw a bed covered
with a bloody sheet.  Deputy Cempa then returned to his vehicle while a
hazardous-entry team was dispatched to the scene.  Another officer, Sergeant
Frank Cempa, Jr., testified that he was also at the scene and that officers knocked
loudly at the door several times and even knocked on the windows but received
no response.  He then called for the hazardous-entry team.  Sergeant Cempa
further testified that he did not see a person sleeping in a chair in the house,
and that he first saw appellant leaving the house in handcuffs.

Sergeant Carlos Castillo
testified that he was a member of the hazardous-entry team that was sent to the
same location and also examined the perimeter of the house.  Like Deputy Cempa,
Sergeant Castillo looked through a bedroom window and saw blood on the bed.  He
also saw blood on the back door, and through another window, he saw appellant
asleep on a recliner.  A member of the hazardous-entry team knocked on the back
door, and appellant walked to the door, opened it, and was immediately
detained.  When Castillo entered the house, he found a pump-action shotgun and
a box of ammunition next to the recliner where appellant had been seated.  

Lieutenant Lester Phipps
testified that appellant’s hands were swabbed at the scene for gunpowder
residue, but the samples turned over to Investigator Rick Waits were not
tested.  According to Lieutenant Phipps, such samples are not tested unless
requested by the investigating detective or the district attorney’s office. 
Waits testified that he arrived at appellant’s residence at approximately 5:00
a.m., after appellant had been taken into custody and removed from the house. 
Waits photographed the scene and collected evidence.  According to Waits, the
shotgun had one shell in the chamber and three more in the cylinder.  Although
the gun was dusted for fingerprints, none were successfully obtained.  Detective
Russell Womble of the Fort Bend County Sheriff’s Office interviewed White at
the hospital and accompanied Detective Josh Dale when the latter interviewed
appellant.  Womble did not request that swabs of appellant’s hands be tested
for gunpowder residue.

Dr. Joanne Oakes treated White
at Memorial Hermann Hospital’s emergency room.  According to Dr. Oakes, White
was wearing a nightgown and stated that her boyfriend shot her in the back
while she was sleeping.  The entrance wound was approximately three centimeters
in diameter, and according to Dr. Oakes, could not have been self-inflicted. 
Dr. Oakes opined that White had been shot from a distance of less than ten
feet.  She further testified that White tested positive for cocaine, which does
not affect memory and could have been ingested days earlier; that White’s blood
alcohol level of .05 was below the legal limit for intoxication; and that White
was lucid, coherent, and cooperative.  According to Dr. Oakes, White’s injuries
were life-threatening; multiple fragments of birdshot had penetrated her back,
causing internal bleeding and deflating one of her lungs.  Medical records
further show that a fragment lodged in or near White’s heart, and she sustained
fractures to her eighth and ninth ribs and one of her vertebrae.  Although doctors
reinflated White’s lung, they were unable to remove the birdshot from her
body.  

B.        Appellant’s Evidence

Appellant’s neighbor Eorline
Rager testified that appellant’s wife died nine months to a year before these
events.  She further testified that she had not seen White before.  According
to Rager, appellant never locked the doors to his house.  A few hours after
appellant’s arrest, Rager entered appellant’s house through the unlocked back
door to care for appellant’s pets, and she stated that she saw no sign that
anyone other than appellant was living there.  She testified that there were no
women’s cosmetics in the house, and that the women’s clothes she saw in
appellant’s closet belonged to appellant’s late wife.  She did not observe any
blood on the floor, windows, or the bed, but she noted that a piece of the
mattress measuring approximately twelve inches square had been removed.  

Another neighbor, Lebert
John Prihoda, testified that appellant’s wife died about twelve months before
these events.  He stated that he lives next door to appellant and did not hear
a shot on the morning of December 17, 2006, but he was “sleeping pretty hard”
and it is possible that a gun could have been discharged without waking him.  Prihoda
testified that he has used shotguns for about sixty years.  He opined that if
someone was shot with a twelve-gauge shotgun at a distance of six feet, any
shot that missed the person’s bones would exit the other side of the person’s
body.  He further stated that he entered appellant’s bedroom the day before he
testified and drew a chart of the bedroom as he observed it, which he
replicated for the jury.[1]  According to
Prihoda, the bedroom door is thirteen feet from the place on the mattress where
blood-stained fabric was removed, and the shotgun seized from appellant’s house
is about forty-two inches long.  He stated that a shot from a twelve-gauge
shotgun at that distance “would do a lot of damage.”  When shown photographs of
appellant’s bedroom taken immediately after the shooting, however, Prihoda was
unable to recognize anything in the room, including the location of a window. 
He agreed it was “very possible” that the bedroom as he observed it on June 23,
2008, had changed since December 17, 2006.

            Appellant’s sister Maria Milligan testified
that appellant’s wife died in August 2006, and she does not believe that
appellant was living with anyone in December 2006; however, she testified that
she had been introduced to White at appellant’s house approximately two weeks
before the shooting.  She further stated that on the same day, White
accompanied appellant when he drove Milligan’s son home.  Milligan testified
that when she arrived to secure appellant’s house at about 10:00 a.m. on
December 17, 2006, Mr. and Mrs. Rager were already there.  She stated that she
saw no blood anywhere and no women’s clothing other than those that had
belonged to appellant’s late wife, but she did observe that a square had been
cut from a mattress.  According to Milligan, the Texaco station is 0.6 miles
from appellant’s house.

            The jury found appellant guilty of
aggravated assault as charged in the indictment, and further found that a
deadly weapon—namely, a firearm—was used or exhibited during the offense.  After
hearing further evidence, the jury assessed punishment at twelve years’
confinement in the Texas Department of Criminal Justice, Institutional
Division, and this appeal timely ensued.

II.  Issues Presented

A person commits assault if,
inter alia, the person intentionally, knowingly, or recklessly causes
bodily injury to another.  Tex. Penal Code Ann.
§ 22.01(a)(1) (Vernon Supp. 2009).  A person who uses or exhibits a deadly
weapon during an assault commits the offense of aggravated assault.  Id. §
22.02(a)(2).  Here, appellant was charged and convicted of intentionally,
knowingly, and recklessly causing White bodily injury by shooting her; the
State further alleged, and the jury found, that he used or exhibited a firearm
during the assault.  In two issues, appellant challenges the legal and factual
sufficiency of the evidence supporting his conviction and the jury’s finding
that he used or exhibited a deadly weapon during the commission of an assault.

III.  Standard of Review

To claim legal insufficiency
is, in effect, to argue that the case is so lacking in evidentiary support that
it never should have been submitted to a jury at all.  Wesbrook v. State,
29 S.W.3d 103, 111 (Tex. Crim. App. 2000).  When evaluating a legal-insufficiency claim, we examine the evidence in the light most favorable to the verdict to
determine whether any rational trier of fact could have found the essential
elements of the offense beyond a reasonable doubt.  Jackson v. Virginia,
443 U.S. 307, 318–19 (1979); Mason v. State, 905 S.W.2d 570, 574 (Tex.
Crim. App.1995).  

When reviewing the factual sufficiency of the evidence to support a conviction, we review all the
evidence in a neutral light, favoring neither party.  Watson v. State,
204 S.W.3d 404, 414 (Tex. Crim. App. 2006); Drichas v. State, 175 S.W.3d
795, 799 (Tex. Crim. App. 2005).  We then ask (1) whether the evidence
supporting the conviction, although legally sufficient, is nevertheless so weak
that the jury’s verdict seems clearly wrong and manifestly unjust, or (2)
whether, considering conflicting evidence, the jury’s verdict is against the
great weight and preponderance of the evidence.  Watson, 204 S.W.3d at
414–15, 417; Johnson v. State, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000).  

 

IV.  Analysis

A.        Legal Sufficiency

            Appellant first contends the evidence is
legally insufficient to support his conviction because the complainant is not
credible.  This argument is based on factual assertions that are not directed
to any element of the offense with which appellant was charged and convicted. 
Moreover, the majority of appellant’s assertions are either unsupported or
contradicted by the record.  According to appellant, neighbors testified that
he went to bed early and kept several shotguns inside his residence, but no
such testimony is found in the record.  He asserts that White testified the
Texaco station where she telephoned for help is two blocks from appellant’s
house; in fact, White testified the distance is “[a]bout half a mile.”  He
contends that White testified she had known appellant for “a couple of months”
and was unaware that his wife had recently died, but in fact, White testified
that she had been in a sexual relationship with appellant for two years and
began living with him after appellant’s wife passed away four months before the
shooting.  Although appellant points out that two of his neighbors never met
White, his sister testified that both she and her son had been introduced to
White at appellant’s home two weeks before the shooting.  

It is the responsibility of
the jury to judge the credibility of witnesses and reconcile conflicts in the
evidence.  Wesbrook, 29 S.W.3d at 111.  And it is well-established that the
testimony of a single eyewitness can prove all of the elements of an offense beyond
a reasonable doubt.  Aguilar v. State, 468 S.W.2d 75, 77 (Tex. Crim.
App. 1971) (testimony of one eyewitness that accused shot complainant in the
back was sufficient to support conviction for assault with intent to murder).  Here,
it is undisputed that a gunshot wound caused White bodily injury.  She
testified without contradiction that appellant shot her, and his intent to do
so may be inferred from his words and conduct, as she described them.  See
Guevara v. State, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004) (explaining that
intent can be inferred from circumstantial evidence).  

In sum, every element of the
charged offense and the jury’s finding is supported by the record.  Viewing all the evidence in the light most favorable to the verdict, we conclude that
a rational trier of fact could have found all the elements of the offense
beyond a reasonable doubt.  We therefore overrule appellant’s first issue.

B.        Factual Sufficiency

            In support of his argument that
the evidence is factually insufficient, appellant asserts that the record shows
he was asleep when the police arrived.  He further states that he continued
sleeping so deeply, “seemingly unaware of the shooting,” that “he did not wake
up after officers banged on the door, and was only then awakened some three hours
after police surrounded the home.”  He contends there is evidence that he owned
several shotguns, and that the complainant did not know him well and was
intoxicated at the time of these events.  

Like the assertions made in
support of his legal-sufficiency argument, these statements are neither directed
to any element of the charged offense nor supported by the record.  Deputy
Cempa and Sergeant Cempa were among the first on the scene; both looked in the
windows of residence, and neither saw appellant, sleeping or otherwise. 
Although appellant did not respond when they knocked loudly on the windows and
doors, there is no evidence he was asleep at that time.  It was only after the
hazardous-entry team arrived that anyone reported seeing him.  At that time,
appellant was sleeping in a recliner in the living room with a loaded
pump-action shotgun and a box of ammunition beside him.  When an officer from
the hazardous-entry team knocked on the back door, appellant answered it and
was taken into custody.  Inasmuch as Deputy Cempa arrived at the gas station at
4:24 a.m. and Investigator Waits testified that appellant already had been
removed when he arrived at the house at approximately 5:00 a.m., it appears
that appellant was taken into custody within about a half hour after the first
officer arrived at the house.  There was no evidence that appellant owned
multiple shotguns or that any other guns were found in his home.  Finally, White’s
testimony that she and appellant had been involved in a sexual relationship for
two years at the time of these events is uncontroverted, as is Dr. Oakes’s
testimony that appellant’s blood-alcohol level was below the legal limit to
establish intoxication.

            Appellant also points out that his
fingerprints were not found on the gun and the State did not match the gun to the
complainant’s injuries.  It is true that no usable fingerprints were obtained
from the gun, and the pellets from the shotgun shell are unavailable because
they are still lodged in White’s body; however, appellant cites no authority
that the evidence of aggravated assault by shooting someone with a firearm is
factually insufficient absent testimony that the ammunition that entered the
complainant’s body was fired from a specific weapon, or that the accused’s
fingerprints were found on that weapon.  

Appellant additionally states
that others had access to the residence and he commonly left his doors unlocked. 
Although this is true, it is also true that White testified that she and
appellant were the only ones in the house at the time of the shooting.  Appellant
further contends that, according to White, no conversation preceded the
shooting; however, White also testified that she and appellant had been arguing
and she was ignoring him when he shot her.  He states that White had been out
with others before the shooting and “had engaged in both drug and alcohol
activity,” but there is no evidence that White’s abilities to accurately
perceive, communicate, or recall the events of that evening were impaired at
any time.  Although appellant also points out that he has no history of
violence, this can be said of every person for at least some part of his or her
life, but for every offender, there is a first offense.  

            Finally, appellant argues that his “mere
presence in the home” and his “proximity to a shotgun,” taken separately
or together, are factually insufficient to support the jury’s verdict or its
finding that he used or exhibited a firearm during an assault.  But these two
factors were not the only evidence submitted for the jury’s consideration.  White’s
testimony that appellant exhibited a gun and used it to shoot her in the back
is uncontroverted.  She identified appellant by name as the offender, described
the house where the shooting occurred, and told police the make, model, and
color of a vehicle parked outside the house.  She also described the weapon,
identified her location within the house at the time of the shooting, and told
them that she left the house through the back door.  Using this information,
police found appellant’s house and vehicle just as White represented them.  They
observed blood on the back door White claimed she used when leaving the house,
and they saw bloodstains on the bed where White said her wounds had been
inflicted.  Inside the residence, police not only discovered the person White
identified, but found him seated beside a loaded gun fitting White’s
description.  

Viewing all the evidence in a neutral light, we cannot say that the jury’s verdict is so contrary to the
overwhelming weight of the evidence as to be clearly wrong and unjust, nor is
the verdict against the great weight and preponderance of the evidence.  We
therefore overrule appellant’s second issue.

V.  Conclusion

Having concluded that the
evidence is legally and factually sufficient to support the verdict and the
jury’s finding that appellant used or exhibited a firearm while committing the
charged offense, we affirm the trial court’s judgment.

            

                                                                                    

                                                                        /s/        Jeffrey
V. Brown

                                                                                    Justice

 

 

 

Panel
consists of Justices Yates, Boyce, and Brown.

Do Not Publish —
Tex. R. App. P. 47.2(b).









[1] Neither
drawing was entered into the record.